Izaak D. Schwaiger, SBN 267888
**SCHWAIGER LAW FIRM**
130 Petaluma Avenue, Suite 1A
Sebastopol, CA  95472
Tel: (707) 595-4414
Fax: (707) 581-1983
E-mail: izaak@izaakschwaiger.com

John Houston Scott, SBN 72578
**SCOTT LAW FIRM**
1388 Sutter Street, Suite 715
San Francisco, CA 94109
Tel: (415) 561-9601
Fax: (415) 561-9609
E-mail: john@scottlawfirm.net

Lee F. Hoffman, SBN 308941
**LAW OFFICE OF LEE F. HOFFMAN**
111 W. Saint John Street, Suite 700
San Jose, CA 95113
Tel: (408) 883-2220
E-mail: leehoffmanjd@gmail.com

Attorneys for ANTHONY PAREDES

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANTHONY PAREDES,<br><br>        Plaintiff,<br><br>v.<br><br>CITY OF SAN JOSE, MICHAEL JEFFREY, BRET HATZENBUHLER, KYLE ALLEMAN, and SHAYNA NAIL.<br><br>        Defendants. | Case No: 5:22-cv-00758-BLF<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES**<br><br>1. **Excessive Force**<br>2. **Failure to Intervene**<br>3. **Unconstitutional Customs and Practices – Use of Force Review**<br>4. **Unconstitutional Customs and Practices – Threat Assessment**<br>5. **Failure to Discipline**<br>6. **Ratification**<br><br>*JURY TRIAL DEMANDED* |

Plaintiff ANTHONY PAREDES alleges violations of his Constitutional rights and complains of Defendants and alleges as follows:

### JURISDICTION AND VENUE

1.    This action arises under 42 U.S.C. § 1983, 42 U.S.C. § 1988, and 42 U.S.C. § 12123. Jurisdiction is conferred by virtue of 42 U.S.C. §§ 1331 and 1343.

2.    As the conduct alleged herein occurred in Santa Clara County, State of California, venue of this action lies in the United States District Court for the Northern District of California by virtue of 28 USC § 1391(b).

### PARTIES

3.    Plaintiff ANTHONY PAREDES is, and at all relevant times was, a resident of Santa Clara County. He is forty-three years old.

4.    Defendant CITY OF SAN JOSE is, and at all relevant times alleged herein was, a public entity situated in the County of Santa Clara, State of California, and organized under the laws of the State of California. The City is, and at all relevant times alleged herein was, responsible for supervising, enacting, and enforcing the conduct, policies, practices, hiring, retention, supervision, and training of the San Jose Police Department and its subordinate units, officers, agents, and employees. The City is liable for the intentional, reckless, and negligent acts of all the aforementioned parties, personnel, and entities as described herein.

5.    Defendant MICHAEL JEFFREY is, and at all relevant times alleged herein was, a police K-9 officer employed by the City of San Jose. In committing the acts and omissions alleged herein, Jeffrey acted under color of law and within the course and scope of his employment for the City.

6.    Defendant BRET HATZENBUHLER is, and at all relevant times alleged herein was, a police K-9 sergeant employed by the City of San Jose. In committing the acts and

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

omissions alleged herein, Hatzenbuhler acted under color of law and within the course and scope of his employment for the City.

7.    Defendant KYLE ALLEMAN is, and at all relevant times alleged herein was, a police officer employed by the City of San Jose. In committing the acts and omissions alleged herein, Alleman acted under color of law and within the course and scope of his employment for the City.

8.    Defendant SHAYNA NAIL is, and at all relevant times alleged herein was, a police officer employed by the City of San Jose. In committing the acts and omissions alleged herein, Nail acted under color of law and within the course and scope of her employment for the City.

9.    In doing the acts and/or omissions alleged herein, defendants and each of them acted under color of authority and/or under color of state law, in concert with each other, and as integral participants in the unconstitutional acts and/or omissions of the others.

### STATEMENT OF FACTS

10.    On February 7, 2020, Mr. Paredes' girlfriend stole two bottles of tequila from a Safeway store on Berryessa Road in San Jose. A store employee attempted to detain Mr. Paredes' girlfriend at the door by grabbing her as she was leaving the store. From the parking lot Mr. Paredes saw his girlfriend being grabbed and ran to her aid. He allegedly threatened the employee, who then released Mr. Paredes' girlfriend, and the two fled the scene on foot.

11.    The Safeway employee called police to report the incident almost immediately. Because a San Jose Police helicopter was flying nearby, it responded to the scene where air officers were able to see Mr. Paredes running away through a residential neighborhood.

12.    San Jose K-9 Officer Michael Jeffrey, K-9 Sergeant Bret Hatzenbuhler, Officer Kyle Alleman, Officer Anthony Ledwith, Officer Shayna Nail, and several other San Jose police

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

officers responded to the call and were informed by the air officers that Mr. Paredes was hiding underneath a large tree in the backyard of a nearby private residence. The officers established a perimeter around the area. The helicopter unit announced via its loudspeaker that officers were preparing to use a police canine, warning residents to stay inside their homes. The helicopter unit then announced that Mr. Paredes had one minute to surrender, or the police would be deployed to locate him. They announced, "When the dog finds you, it may bite you."

13.     The air unit then relayed to the officers on the ground that Mr. Paredes had left his position under the tree, and that he had climbed inside a plastic yard waste bin on the side of the house.

14.     Sergeant Hatzenbuhler, Officer Jeffrey, Officer Alleman, Officer Ledwith, and Officer Nail entered the backyard while the helicopter circled overhead. Officer Jeffrey's K-9 led the way, followed by Officer Jeffrey. Other officers surrounded the parcel cutting off any avenue of escape. Officer Jeffrey deployed his K-9 unit to locate Mr. Paredes, and the dog quickly did, alerting to the yard waste bin in the back of the residence. Officer Jeffrey commanded the K-9 to bark, and the dog pawed at the bin and barked continuously for almost a minute as the officers approached with their firearms drawn. None of the officers announced their presence or requested Mr. Paredes come out of his hiding spot. Instead, Sergeant Hatzenbuhler grabbed a long broom from beside the house and pushed the top of the bin to topple it over. He pushed the bin several times, but was unable to topple it. Officer Alleman walked forward and shoved the garbage bin over with his hands, though the lid remained closed. Attempting to surrender, Mr. Paredes called out, "Alright! Alright!"

15.     Officer Alleman grabbed the base of the bin and pulled it back toward the officers, but the lid remained closed. "Alright! Alright!" Anthony called out again. Officer Jeffrey stepped forward and pulled on the base of the garbage bin again, yanking it backward and causing the lid

- 4 -

to open and exposing Mr. Paredes inside. Officer Jeffrey order his K-9 to bite. "Show us your hands!" the officers yelled. But before Mr. Paredes could respond, the K-9 unit clamped down on Mr. Paredes' neck, crushing his throat. The force behind a German Shepherd's bite is 1200 pounds per square inch. Mr. Paredes tried to call out, but only gurgling sounds came out of his mouth. "Don't fight the dog! Let go of the dog!" the officers yelled.

16.    Sergeant Hatzenbuhler and Officer Alleman pulled Mr. Paredes out of the bin, but the K-9 remained clamped onto his throat. Officer Alleman stepped on Mr. Paredes hand, pinning it to the ground while the dog continued to tear at Anthony's throat. Mr. Paredes was not resisting. At no time did Mr. Paredes pose more than a hypothetical threat to any of the officers.

17.    "Mike, get him off. Mike. Get him off. Get him off." Officer Ledwith called to Officer Jeffrey, but Officer Jeffrey did not release his dog. Instead, and contrary to his training, Officer Jeffrey began to pull on the dog's harness as the dog shook its head left to right violently. K-9 officers are trained to remove a bite in several different ways, but never to pull back against the curvature of the K-9's teeth. All K-9 officers are trained that by pulling against a bite further harm will be caused as the animal's teeth tear the already existing wound open further. Officer Jeffrey received such training and elected instead to pull on his K-9 as it remained latched around Mr. Paredes' neck. Officer Jeffrey pulled on the K-9's harness with enough force to lift the dog and Mr. Paredes' torso off the ground.

18.    Hatzenbuhler and Alleman grabbed onto Mr. Paredes' arms as Officer Jeffrey continued to pull against the K-9's harness. Sergeant Hatzenbuhler put Anthony's left arm in an armbar control hold and stepped on the side of Mr. Paredes' head as the dog continued its deadly attack, tearing into Anthony's neck. Officer Alleman stepped on Anthony's right shoulder, pinning him to the ground, and pointed his pistol at Mr. Paredes' face. Sergeant Hatzenbuhler released his foot from atop Mr. Paredes' head and once more Officer Jeffrey pulled his K-9 off

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

- 5 -

the ground, lifting Mr. Paredes' with him. Mr. Paredes tried to scream, but no sound would come out as his airway began to fill with blood. Thirty-five seconds from when the K-9 bit Mr. Paredes around his throat, it had still not let go of its crushing, tearing bite. "Stop fighting! Stop fighting! Stop fighting!" the officers shouted, but Mr. Paredes was not fighting. Instead, he hung limp from the animal's jaws, his face covered in blood while he mouthed pleas of help. Officer Jeffrey finally ordered his K-9 to release, but the animal did not respond. He ordered it to release again, and again, but the animal kept its jaws clamped around Mr. Paredes' throat. Sixty seconds after the bite, the animal finally released, and Mr. Paredes had almost been killed.

19.    Other than Officer Ledwith's pleas for Officer Jeffrey to get the dog off of Anthony, no officer present made any attempt to rescue Mr. Paredes from the horrific mauling taking place before them, though each had the duty and ability to do so. Had the dog been attacking a police officer in a similar matter, it would have been tasered or shot. But Officer Nail stood by inches from Mr. Paredes holding a pair of handcuffs, doing nothing to intervene, and uttering not a word in protest to the unconscionable acts occurring before her. Instead she handcuffed Mr. Paredes as he lay on the ground with his throat ripped open. Sergeant Haztenbuhler, a K-9 sergeant with superior knowledge and training, did nothing to stop the mauling. Instead, he held Anthony's arm in a control hold and stepped on his face, giving the dog free access to continue its ferocious attack. Officer Alleman did nothing to stop the mauling. Instead, he stepped on Anthony's shoulder and put a gun in his face.

### STATEMENT OF DAMAGES

20.    As a result of the acts and/or omissions alleged herein, Plaintiff suffered general damages including pain, disfigurement, fear, anxiety, emotional trauma, humiliation, and disability in an amount according to proof.

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

21.     Plaintiff suffered multiple puncture wounds and deep lacerations to his neck. His hyoid bone and thyroid cartilage were broken, and one vertebra partially crushed. His larynx suffered such profound trauma that Mr. Paredes, once a talented singer, has lost the ability to sing, his voice has been permanently changed, and in the nearly three years since these events his throat makes clicking sounds when he speaks. Plaintiff further suffered damage to the cartilage in his neck, permanent nerve damage, and his neck remains grossly disfigured from scarring on account of the acts of these defendants. He suffers continuing shoulder pain in his left shoulder so serious that it wakes him from his sleep at night.

22.     Plaintiff's serious physical injuries and emotional distress resulted in significant medical and related expenses and will likely necessitate continuing medical treatment and related expenses in amounts to be determined according to proof.

23.     The acts and omissions of Officer Jeffrey, Sergeant Hatzenbuhler, Officer Aleman, and Officer Nail were willful, wanton, reckless, malicious, oppressive and/or done with a conscious or reckless disregard for the rights of Plaintiff.  Plaintiff therefore prays for an award of punitive and exemplary damages against these defendants in an amount according to proof.

24.     Plaintiff has retained private counsel to represent him in this matter and is entitled to an award of attorneys' fees and costs.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**[42 U.S.C. §1983 – FOURTH AMENDMENT – EXCESSIVE FORCE – AGAINST OFFICER JEFFREY, SERGEANT HATZENBUHLER, AND OFFICER ALLEMAN]**

25.     Plaintiff hereby alleges and incorporates by reference as though fully set forth herein all prior paragraphs of this Complaint.

- 7 -

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

26.    Officer Jeffrey, Sergeant Hatzenbuhler, and Officer Alleman violated the Plaintiff's clearly established right to be free from the intentional and unreasonable use of excessive force as guaranteed by the Fourth Amendment to the United States Constitution.

27.    An objectively reasonable officer would have known that the use of force upon the Plaintiff was excessive and could cause serious injury, especially given the fact that the only exposed parts of Mr. Paredes' body that could have been bitten by the dog were his head and neck. Such a situation would lead a reasonable officer to believe that the force he was employing would create a substantial risk of death or serious bodily harm.

28.    These defendants further knew that by using control holds on Mr. Paredes while he was being mauled, that he would be utterly defenseless to save himself. Hatzenbuhler and Alleman's individual uses of force were unreasonable under the circumstances and contributed significantly to Plaintiff's injuries.

29.    The Fourth Amendment does not permit the use of deadly force to apprehend a suspect who poses no immediate threat to the officer or others.

30.    Defendants Jeffrey, Hatzenbuhler, and Alleman were integral participants to each other's constitutional violations, in that they were aware of the constitutional limitations on the use of force, were aware that Mr. Paredes was not actively resisting, that he posed not more than a hypothetical and attenuated threat to anyone, that he was surrounded and could not flee, and that he was attempting to surrender. Yet these defendants were aware of Officer Jeffrey's decision to use force which created a substantial risk of death or serious bodily harm and participated in the execution of that decision. Officer Alleman tipped the bin over to expose Plaintiff to the K-9's attack, and Alleman and Hatzenbuhler pulled the bin backward to make the Plaintiff more easily accessible to the K-9's bite. Both Hatzenbuhler and Alleman held Plaintiff in place while the dog ripped as his throat, Hatzenbuhler stepping on Plaintiff's head to hold him in place while he was

- 8 -

being attacked, and Alleman stepping on Plaintiff's hand, and then his shoulder while pointing a gun in his face.

31.    Not only was Defendant Jeffrey's decision to deploy the dog unreasonable, but his handling of the canine while its jaws remained clamped onto Mr. Paredes neck evinced malice and sadism. According to industry standards, the average police canine bite should last between five and fifteen seconds. According to all police canine training, no handler should ever pull on the dog to release its bite. Yet here Officer Jeffrey allowed the canine to tear into Plaintiff's neck for an entire minute, and pulled the dog against its bite numerous times, leading to life lasting injury for Mr. Paredes.

32.    The harm to Plaintiff was foreseeable to these defendants.

33.    These defendants acted willfully, wantonly, maliciously, oppressively, and with conscious disregard to the Plaintiff's rights.

34.    These defendants' misconduct was the moving force that caused Plaintiff's injuries.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

### [42 U.S.C. §1983 – FAILURE TO INTERVENE – AGAINST SERGEANT HATZENBUHLER, OFFICER ALLEMAN, AND OFFICER NAIL]

35.    Plaintiffs hereby allege and incorporate by reference as though fully set forth herein all prior paragraphs of this Complaint.

36.    Defendants Hatzenbuhler, Alleman, and Nail had a duty to intervene when Officer Jeffrey ordered his K-9 to bite Plaintiff without legal justification. They further had a duty to intervene when the K-9 went straight for Mr. Paredes' throat and latched on – a visible use of deadly force. They further owed Mr. Paredes' a duty to intervene when Officer Jeffrey began pulling at his K-9's harness, lifting Mr. Paredes off the ground by his neck. They further had a duty to intervene when the K-9 did not release its bite and continued tearing at Plaintiff's neck for

- 9 -

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

a whole sixty seconds. These defendants had the time, ability, and opportunity to observe what was happening to Plaintiff and to stop it. They owed Plaintiff that basic duty. But these defendants stood by, and Hatzenbuhler and Alleman in fact *stood on* Plaintiff as he was mauled by the police dog for an entire minute, and these defendants did nothing to stop the outrageous assault occurring before them. No one except Officer Ledwith uttered a word of protest, and no one took and physical action to save Mr. Parades.

37.     Any objectively reasonable officer would have known it was necessary to intervene to stop Plaintiff from being seriously injured or killed.

38.     These defendants failure to intervene were moving forces that caused Plaintiff's injuries and needless suffering.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION

**[42 U.S.C. § 1983 – MUNICIPAL LIABILITY FOR CUSTOMS AND PRACTICES (USE OF FORCE REVIEW WITHIN THE CANINE UNIT) – CITY OF SAN JOSE]**

39.     Plaintiff hereby re-alleges and incorporates by reference as though fully set forth herein all prior paragraphs of this Complaint.

40.     The San Jose Canine Unit is comprised of two teams of canine handlers. Each team has three to four handlers and a sergeant. In the course of a given year, these six to eight dogs average 35 to 40 bites combined. Each time a dog bites, a suspect is injured. San Jose categorizes the use of a canine as a "Level 3" use of force, in between the use of a Taser or baton ("Level 2") and deadly force ("Level 4"). Despite this acknowledgment of the serious and sometimes life-threatening nature of these uses of force, the City of San Jose, through its final policymakers, acted with deliberate indifference to the rights of Mr. Paredes, and of the public in general, by knowingly maintaining, enforcing, and applying customs and practices within its canine unit that have led to scores of unnecessary injuries, including those suffered by Mr. Paredes'.

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

41.    This included a practice of conducting sham reviews of all uses of force within the canine unit where the outcome of those reviews had been predetermined. This practice involved the initial investigation of the use of force being conducted by the canine sergeant. Problematically, the canine sergeant conducting this investigation was almost always directly involved in the very use of the force being investigated, and his investigation would typically be reviewed only by the canine unit's chain of command who had no training in use of force analysis. The use of force review would then receive an automatic stamp of approval by the Chief of Police or his delegee. The point of these "reviews" was to insulate known bad actors from discipline and liability. The obvious bias and dishonesty in such investigations was known by City policymakers, yet this practice was embraced up to any beyond the date of Mr. Paredes' injury.

42.    At the time of these events, Canine officers were trained and expected to document only their own actions and their observations of a suspect, and never to document the actions of other canine officers, thereby lessening the possibility that conflicting narratives could exist which might undermine the canine handler's story about what he did and why. Non-canine officers who might accompany the canine team during an arrest were trained and expected not to author reports of the incident at all, and for the same reason.

43.    Of the close to 200 canine bites that occurred in the five years prior to this incident, every bite was investigated by the canine unit itself, and each was subsequently rubber-stamped to be within policy. No retraining or discipline was ever imposed no matter how egregious the circumstances, and no canine or canine handler was ever removed from the canine assignment for policy violations or poor performance in the field.

44.    In June of 2020, the Department's Use of Force Committee convened to review national best practices for force review. During their research, the Committee "*discovered*

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

*varying levels of force investigation and oversight within the Department. Approaches to force review ranged from a simple supervisory in-field response to in-depth post-incident analysis. Additionally, the personnel scrutinizing the officers' actions may or may not have been trained in force analysis, decision making, or human factors.*" The Committee noted that "*Use of Force Command Reviews were being evaluated by lieutenants with no prescribed requisite training or experience necessary to complete those reviews.*" As a result, the Use of Force Committee recommended to the Chief of Police the establishment of a "specially-trained cadre of command officers to review and analyze the Department's use of force," the Executive Force Review Committee (EFRC).

45.    In December of 2021, the Department's Use of Force Policy was changed to require that all canine apprehensions be reviewed by the EFRC *instead of the canine unit chain of command*. The EFRC was comprised of three command officers specially trained in force analysis and decision-making under stress. Additionally, the EFRC maintained twelve use of force experts upon whose expertise the Committee could rely. As a result of this change, within four months of standing up the new committee the canine unit suffered its first sustained violation of the Department's Use of Force policy ever, despite the canine unit's own review of that very incident having cleared the officer of any wrongdoing. The officer was removed from the canine unit and his dog retired. The identity of that officer is subject to this Court's Protective Order, and is contained in the Declaration of Izaak Schwaiger, filed under seal as Exhibit A to this Complaint.

46.    These customs and practices were so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused his injuries. Officer Jeffrey, Sergeant Hatzenbuhler, Officer Alleman, and Officer Nail were aware of these customs and practices, and reasonably

believed that they would not be held accountable for any force they used, participated in, or failed to stop, no matter how egregious.

### FOURTH CAUSE OF ACTION

### [42 U.S.C. § 1983 – MUNICIPAL LIABILITY FOR CUSTOMS AND PRACTICES (THREAT ASSESSMENT) – CITY OF SAN JOSE]

47.    Plaintiff hereby re-alleges and incorporates by reference as though fully set forth herein all prior paragraphs of this Complaint.

48.    The San Jose Police Department's official Canine Policy requires that all uses of a canine to apprehend a suspect must meet certain enumerated criteria. Those criteria are:

    a.    The handler reasonably believes that suspect is committing, has committed, or is about to commit a felony crime, or a misdemeanor crime involving a weapon or violence; and

    b.    There is a reasonable belief that the individual poses an *immediate threat* of violence or serious physical injury to any person; and

    c.     There is a reasonable belief that the suspect is actively fleeing, physically resisting, or threatening to resist arrest and the use of the canine would overcome such resistance, prevent injury to arresting officers or other persons and ensure the apprehension of the subject; or

    d.    The individual is believed to be hidden in an area where the use of the canine would reduce the threat of violence or serious physical injury to officers or members of the public.

49.    Despite the existence of this official policy, the *de facto* policy of the San Jose Police Department is to treat every encounter as an "immediate threat" regardless of the circumstances, thus eliminating any objective analysis of an encounter on a case-by-case basis, and expanding the use of the canine to situations where such use could never be considered

- 13 -

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

objectively reasonable. The de facto policy allows handlers to use their canines on surrendering subjects, unarmed subjects who are hiding and pose no more than a hypothetical threat, or suspects whose initial crime is so attenuated in time as to no longer form the basis for any existing threat's "immediacy." In one such case, an unarmed subject with his hands in the air was deemed an "immediate threat." In another, an unarmed man in bed was an "immediate threat." Several unarmed individuals who were hiding from police, and who had made no threats or overtures of harm toward them were deemed "immediate threats" as well.

50.     Among all factors relevant to the use of force, the immediacy of the threat posed by the suspect is the most important. While the City's written policy gives lip service to that long-established dictum, its *de facto* policy disregards it entirely.

51.     According to a San Jose police lieutenant deposed in this action, Canine handlers are trained that the "immediate threat" their policy requires for a canine deployment may be found in any situation where the suspect has the "opportunity and ability" to cause harm to an officer, coupled with the suspect "actively fleeing" from the officers. "Actively fleeing" from an officer would include any scenario where the suspect is hiding. It is immaterial that a suspect might be unarmed or have made no threatening overtures. If he is fleeing or hiding and has the opportunity and ability to cause harm, he is deemed an immediate threat and a canine may be used. Because any police encounter with the public presents some "opportunity" for harm to the officer, and because all public persons have some "ability" to harm an officer, this *de facto* policy allows the use of a canine on any person who is fleeing or hiding from police. This practice effectively subsumes the written policy's requirement of showing an immediate threat into what should have been a separate requirement of showing that a suspect is fleeing or hiding. This policy shortcut has led to the unnecessary and unlawful use of severe force on suspects who posed little-to-no actual threat to officers or the public.

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

52.     These customs and practices were so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused his injuries.

### FIFTH CAUSE OF ACTION

**[42 U.S.C. § 1983 – MUNICIPAL LIABILITY FOR FAILURE TO DISCIPLINE – CITY OF SAN JOSE]**

53.     Plaintiff hereby re-alleges and incorporates by reference as though fully set forth herein all prior paragraphs of this Complaint.

54.     At the time of this incident, no SJPD canine handler had ever been found in violation of City policy based on a use of force involving a canine. Throughout his career as a canine handler, Officer Jeffrey had employed his canine on 25 or 26 occasions that resulted in a bite to a suspect. The vast majority, if not all, of these bites were observed by a canine sergeant. All of them were investigated by the canine sergeant and determined to be within policy. All of those investigations were reviewed by the canine lieutenant and found to be within policy. All of those reviews were approved by the Chief of Police or his delegee and found to be within policy. But any objective review of these canine apprehensions, most of which were captured on body-worn camera, would have shown massive departures from formal department policy and contemporary police standards and practices. Nevertheless, the City repeatedly failed to take appropriate corrective action such as remedial training or discipline against Officer Jeffrey when he had numerous such violations associated with his canine deployments.

55.     In the months leading up to this incident, Officer Jeffrey had six canine deployments that should have resulted in discipline for violating policy and/or the law.

   a.   On or about September 14, 2018, Officer Jeffrey ordered his canine to bite a man, and the dog did not release after four verbal commands. As here, Officer Jeffrey pulling on the dog's collar against its bite, opening the victim's wounds further. The canine remained thrashing into the victim's wounds for forty-two seconds.

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

b.  On or about November 24, 2018, Officer Jeffrey ordered his canine to attack a man who was visibly surrendering to police. The dog attacked his face and arm, where it remained attached for eighty-nine seconds. Again, the dog failed to respond to three verbal commands to release. Again, Officer Jeffrey pulled the dog against the man's wounds.

c.  On or about December 29, 2018, Officer Jeffrey ordered his canine to attack a young man in his bed. The dog did not release for forty-three seconds, and only after failing to respond to its electronic control collar and failing to respond to three verbal commands to release. Again, the victim's wounds were exacerbated by Officer Jeffrey pulling the dog's collar against the bite.

d.  On or about July 18, 2019, Officer Jeffrey deployed his K-9 to bite a suspect in a commercial building. The dog attacked the man, biting him about the head and face, then tearing into his arm. Jeffrey and the other officers with him watched the dog viciously maul the man for more than thirty seconds before approaching to take the suspect into custody, all the while the man screamed, "Help me! Please, sir! Help me! Help me!" The dog thrashed his head against the suspect's wounds for sixty-six seconds before releasing, and then only after the canine refused to release after four verbal commands. Again, Officer Jeffrey pulled the dog against its bite, exacerbating the already grievous injuries to the man.

e.  On or about October 6, 2019, Officer Jeffrey deployed his K-9 to bite a man hiding in a shed. The dog bit and did not release. Officer Jeffrey pulled on the dog's collar to drag the man from the shed, further exacerbating his wounds as he screamed in pain. The dog thrashed its head back and forth for seventy seconds

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

before releasing. The dog disobeyed four commands to release. The suspect was seriously injured as a result.

f.   On or about September 23, 2019, Officer Jeffrey sicced his K-9 on another man hiding from police in a shed. As in Mr. Paredes' case, the suspect was trying to surrender. His hands were up, open, and he was laying on his back and visibly not actively resisting. Officer Jeffrey ordered his K-9 to bite the man, and then dragged the man out of the shed by pulling on the K-9's harness while its teeth remained latched into the man's leg, causing the K-9's teeth to tear into his flesh and exacerbate his wounds, just like Plaintiff's. The dog did not release its bite for a full thirty seconds. And as here, the canine failed to disengage when Officer Jeffrey commanded it to.

56.    The City, through its agents and employees including the Chief of Police or his delegee, was aware of each of these prior uses of force, as each was recorded on bodycam video and administratively reviewed by the chain of command. Despite clear departures from policy and law (the duration of each bite far exceeded industry standards, in two cases the suspect was visibly attempting to surrender when the canine was deployed, in every case Officer Jeffrey failed to obtain timely release of the canine's bite even after the subject was in restraints, and in every case Officer Jeffrey pulled his canine against the bite, needlessly exacerbating the subject's wounds), the City imposed no discipline or retraining on Officer Jeffrey. They in fact condoned and ratified his continuing unconstitutional conduct, encouraging future unconstitutional acts such as the attack on Mr. Paredes.

57.    The need to curtail Officer Jeffrey's dangerous and unlawful uses of force was so obvious that the City and its policymakers, including the Chief of Police or his delegee, had to be aware that by failing to hold Officer Jeffrey accountable, either by terminating his employment,

- 17 -

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

disciplining him, or removing him from the canine team, that further future deprivations of constitutionally protected rights would occur. The decision not to discipline Officer Jeffrey was a conscious one. It was the result of a deliberate process that validated every canine deployment as within policy, no matter the circumstances, so as to shield officers and the City from any appearance of misconduct, and to limit their exposure to civil liability. The failure to discipline Officer Jeffrey thus amounted to deliberate indifference on the part of the City and its policymakers, and was so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused the injuries to Plaintiff.

58.    The failure to discipline Officer Jeffrey was so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused his injuries.

## SIXTH CAUSE OF ACTION

### [42 U.S.C. § 1983 – MUNICIPAL LIABILITY FOR RATIFICATION – CITY OF SAN JOSE]

59.    Plaintiff hereby re-alleges and incorporates by reference as though fully set forth herein all prior paragraphs of this Complaint.

60.    Dave Tindall, then Acting Chief of Police, had final policymaking authority for the City of San Jose concerning the acts and omissions of police officers within his chain of command.

61.    Chief Tindall ratified the acts and omissions of Defendants Jeffrey, Hatzenbuhler, and Alleman by reviewing and approving their acts and omissions alleged herein and the reasons for them. Chief Tindall directed a review of these events be undertaken, but allowed Defendant Hatzenbuhler to conduct that review, despite his involvement in the use of force being reviewed. Hatzenbuhler's report examined these defendants' acts and the reasons for them, and concluded that those acts and omissions were reasonable and within SJPD policy. This review included all of the documentary evidence in the matter, including the body-worn camera footage of the

officers present. Defendant Hatzenbuhler's conclusions were then passed up the chain of command to Lieutenant Steve Lagorio, who reviewed the same materials and approved the defendants' acts as reasonable and within policy. The report was then approved by a SJPD captain and then a bureau commander – both deeming these defendants' acts and omissions within policy. Finally, Chief Tindall reviewed these events and found that force used was "objectively reasonable", that the use of force was "within policy", and that the defendant officers would be "exonerated" of any wrongdoing.

62.     These affirmative and deliberate acts and omissions by the final policy makers for the City of San Jose ratified the conduct of these named defendants and their reasons for the conduct. Each individual defendant remained on duty, undisciplined, and with no remedial training, despite the graphic video evidence of an unconscionable use of force.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.     For compensatory and economic damages according to proof;

2.     For general damages according to proof;

3.     For an award of exemplary or punitive damages against the individual defendants;

4.     For an award of attorneys' fees and costs as permitted by law; and

5.     For such other and further relief as the Court may deem necessary and appropriate.

### JURY TRIAL DEMAND

Plaintiff hereby requests a jury trial on all issues so triable.

Dated: August 18, 2023                    **SCHWAIGER LAW FIRM**

/s/ Izaak D. Schwaiger
Izaak D. Schwaiger
Attorney for Plaintiff

SCHWAIGER LAW FIRM
130 PETALUMA AVE. STE. 1A
SEBASTOPOL, CA 95472

# Exhibit A
# (Redacted)

1   Izaak D. Schwaiger, SBN 267888
    **SCHWAIGER LAW FIRM**
2   130 Petaluma Avenue, Suite 1A
    Sebastopol, CA 95472
3   Tel: (707) 595-4414
    Fax: (707) 581-1983
4   E-mail: izaak@izaakschwaiger.com

5   John Houston Scott, SBN 72578
    **SCOTT LAW FIRM**
6   1388 Sutter Street, Suite 715
    San Francisco, CA 94109
7   Tel: (415) 561-9601
    Fax: (415) 561-9609
8   E-mail: john@scottlawfirm.net

9
    Lee F. Hoffman, SBN 308941
10  **LAW OFFICE OF LEE F. HOFFMAN**
    111 W. Saint John Street, Suite 700
11  San Jose, CA 95113
    Tel: (408) 883-2220
12  E-mail: leehoffmanjd@gmail.com

13
    Attorneys for ANTHONY PAREDES
14

15

16                    **UNITED STATES DISTRICT COURT**

17                    **NORTHERN DISTRICT OF CALIFORNIA**

18

19
    ANTHONY PAREDES,                          Case No: 5:22-cv-00758-BLF
20
            Plaintiff,                        **[REDACTED]**
21
    v.                                        **DECLARATION OF IZAAK D.**
22                                            **SCHWAIGER**
    CITY OF SAN JOSE, MICHAEL JEFFREY,
23  BRET HATZENBUHLER, KYLE
    ALLEMAN, and SHAYNA NAIL,
24
            Defendants.
25

26

27

28

I, Izaak, declare as follows:

1.     I am counsel of record for the plaintiff in this matter. I have personal knowledge of the following facts and would testify competently thereto if called as a witness.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 18th day of August, 2023, in Pine Hill, New York.

/s/Izaak D . Schwaiger
Izaak D. Schwaiger

- 1 -

(REDACTED) DECLARATION OF IZAAK D. SCHWAIGER