United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY LUIS PAREDES,

Plaintiff,

v.

CITY OF SAN JOSÉ, et al.,

Defendants.

Case No.  22-cv-00758-PCP

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. No. 108

Plaintiff Anthony Paredes ("Paredes") brings claims against San José police officers Michael Jeffrey ("Jeffrey"), Kyle Alleman ("Alleman"), and Bret Hatzenbuhler ("Hatzenbuhler"), as well as the City of San José, arising from his arrest on February 7, 2020. Paredes sues the officer defendants for excessive use of force, claiming a violation of his Fourth Amendment rights. Paredes's claims against the city proceed under the theory that the city's failure to discipline Jeffrey's prior conduct and/or the city's ratification of that conduct led directly to the deprivation of his rights.

The defendants now move for summary judgment, arguing that Paredes's Fourth Amendment rights were not violated, that the officer defendants are entitled to qualified immunity, and that Paredes cannot show any disciplinary failure by the city. After careful review of the relevant evidence and following oral argument on the motion, the Court grants the motions for summary judgment to the extent not opposed by Paredes, and otherwise denies the motions.

**BACKGROUND**

**I.      Facts leading up to the arrest**

On February 7, 2020, Anthony Paredes accompanied his girlfriend to the Safeway on Berryessa Road in San José, California. Dep. of Anthony Paredes ("Paredes Dep.") 62, Dkt. No.

114-1, 108-9. While Paredes cashed a check across the street, his girlfriend attempted to steal alcohol from the Safeway. *Id.* at 62:20–23, 85. A store security guard grabbed her, which prompted Paredes to run to the store entrance. *Id.* at 77:24–80:8. A store employee called the police, and a nearby police helicopter followed Paredes as he fled through residential neighborhoods. *Id.* at 91:2–92:5, 97:11–99:4. Paredes entered the backyard of a private residence, then hid atop a fence that separated two backyards, crouching to conceal himself beneath an overhanging tree. *Id.* at 102:22–103:21; 107:8–15. The helicopter continued to circle overhead, making announcements calling for Paredes to surrender. *Id.* at 107:16–108:6. Paredes remained hidden for 45 minutes to an hour. *Id.* at 108:13. During this time, the helicopter continued to record video of the unfolding events. *See* Air 3 FLIR SJ 00141 Video ("Air 3"), Dkt. No. 115, Exh. 15.

As all of this was occurring, officers from the San José Police Department ("SJPD") formed a perimeter around the residence. Decl. of Bret Hatzenbuhler ("Hatzenbuhler Decl.") ¶21, Dkt. No. 108-15. Hatzenbuhler assembled an arrest team consisting of patrol officers Nail and Ledworth and canine handlers Alleman and Jeffrey. *Id.* at ¶22. The officer defendants allege that prior to moving forward with the arrest, they learned that Paredes had threatened to "cut" a Safeway employee and that Paredes was involved in a prior armed robbery at the same store in which he used pepper spray against a guard. *Id.* at ¶19; Decl. of Michael Jeffrey ("Jeffrey Decl.") ¶¶9–10, Dkt. No. 108-1. The transcript of the 911 call made by the Safeway employee that day shows that the employee reported an unarmed robbery. Partial 911 Audio Transcript ("911 Call"). Dkt. No. 115-3 Exh. 3. The dispatch broadcast reported a "211 strong arm," which is a robbery committed without the use of a weapon. Dispatch Audio Transcript ("Disp. Transcript") 5, Dkt. No. 115-3 Exh. 7. The dispatch audio further advised that the vehicle associated with the February 7, 2020 events was involved in a prior incident at the same Safeway in which "a Hispanic female" used pepper spray. *Id.* The officers in their declarations stated that they believed Paredes might have been armed with some sort of "bladed weapon." Hatzenbuhler Decl. ¶¶19, 24; Jeffrey Decl. ¶9.

The helicopter made a second announcement, warning Paredes that if he failed to surrender

the police may release a canine to find him. Hatzenbuhler Decl. ¶21; Paredes Dep. 108:21–109:15.

Paredes then moved from underneath the tree to stand at the corner of the house. Paredes Dep.

109:20–22. On the helicopter video, an officer can be heard saying "it does look like he is trying

to surrender." Air 3 at 27:55. Paredes then opened a plastic garbage can in the side yard of the

residence and climbed inside. Paredes Dep. 109:20–22. The officer in the helicopter then stated,

"he may have jumped into a garbage can." Air 3 at 28:27. At that point, the arrest team entered the

backyard. Jeffrey Decl. ¶11. Jeffrey released the canine, "Tex" to search for Paredes. Hatzenbuhler

Dec., ¶¶23–24; Jeffrey Dec., ¶¶11–12.

**II.      The arrest**

        Paredes's arrest and the minutes that preceded it were recorded on all five of the arresting

officers' body worn cameras and the Air 3 video. Unless otherwise noted, the following

background summary is drawn from these six videos.

        As Tex ran ahead, the officers entered the backyard with Alleman leading the way. The

officers proceeded in single-file formation around a pool. Jeffrey commanded Tex to bark, and

Tex then ran ahead toward the side yard where Paredes was hiding inside of the garbage can.

Multiple officers initially proceeded with their firearms drawn, but as they moved through the

backyard and approached Paredes's hiding place the officers holstered their weapons. Only

Alleman kept his firearm drawn throughout the arrest. Tex alerted on the garbage can as the

officers approached. The officers did not announce their presence. Dep. of Officer Jeffrey

("Jeffrey Dep.") 158:8–159:11, Dkt. Nos. 114-1. Hatzenbuhler grabbed a long broom and

attempted to topple the garbage can. When that proved unsuccessful, Alleman used his hands to

tip the garbage can onto its side. As Alleman began shoving the can Paredes yelled "Alright!

Alright! Alright!" and "Hold on guys!" His yells are audible on all five of the officers' body worn

cameras. The sound of the helicopter circling overhead is also audible on all five of the officers'

body worn cameras. Jeffrey then pulled the can off Paredes, first revealing his head and neck. As

Paredes emerged from the can, the officers yelled "show us your hands!" and "do not fight the

dog!"

        After Jeffrey pulled back the can revealing Paredes, he commanded Tex to bite. Tex bit

United States District Court
Northern District of California

1  Paredes, clamping down around his throat. Tex did not release from Paredes's throat for

2  approximately 60 seconds. During this time, the body worn cameras depict an officer saying,

3  "Mike, get him off." The cameras depict Jeffrey yelling "Out!" multiple times. The officer

4  defendants characterize this as a verbal command intended to release Tex from his bite. Jeffrey

5  Decl. ¶17. Jeffrey twice pulled Tex back by his collar while Tex remained locked around Paredes'

6  throat. When this occurred, Paredes was lifted into the air by his throat, held only by Tex's bite.

7  Only his legs remained on the ground. The body worn cameras depict Paredes suspended by his

8  throat for over 30 seconds. The officer defendants characterize these actions as Jeffrey performing

9  a "manual removal," or a physical command to Tex to release from his hold. *Id.* As Paredes

10 remained suspended, Jeffrey removed one hand from Tex's collar to fumble with something on his

11 person. The officers said, "zap him, zap him," and Alleman reached over to fumble with

12 something on Jeffrey's person. The officer defendants characterize these actions as engaging

13 Tex's e-collar and initiating a shock command to release Tex from his bite. *Id.* at ¶19;

14 Hatzenbuhler Dep. ¶30. The officer defendants state that they later discovered that Tex's e-collar

15 had dislodged and was thus ineffective. Jeffrey Dep. ¶17.

16    After these efforts failed, Hatzenbuhler said, "Mike, choke with two hands, please," and

17 Jeffrey replaced both hands on Tex's collar. Toward the end of the encounter, Jeffrey said "fuck,"

18 appeared to lose his grip on Tex, and then pulled back again to regain his grip. On numerous

19 occasions, the body worn cameras depict Jeffrey struggling to control Tex while Paredes remains

20 suspended.

21    Throughout the encounter, Alleman pointed his gun at Paredes and stood on Paredes's

22 right hand. Hatzenbuhler held Paredes's left hand in an armlock and, at various points, stood on

23 his head. As Paredes remained suspended, the officers said things like "stop fighting" and "watch

24 his feet." The body worn cameras generally do not depict Paredes resisting the officer defendants

25 or Tex. On at least one occasion, Paredes attempted to gasp or cry out. As the encounter

26 continued, Paredes's face and neck became covered with blood. After approximately 60 seconds,

27 Tex released. Paredes then fell to the ground. The officers handcuffed him, stood him upright, and

28 took him to the front yard.

1    **III.    Case posture**

2        Paredes's Third Amended Complaint alleges six causes of action against the defendants.

3    The city moved for summary judgment on all six, and Paredes concedes that three must be

4    dismissed.[1] The three remaining claims are as follows:

5    - ***Against Jeffrey, Hatzenbuhler, and Alleman****:* deprivation of Paredes's Fourth

6        Amendment rights, in violation of 42 U.S.C. § 1983, based on the defendants' use

7        of deadly and/or excessive force during the arrest.

8    - ***Against the city***: Failure to discipline officer conduct leading to a deprivation of

9        Paredes's Fourth Amendment Rights, in violation of 42 U.S.C. § 1983 and *Monell*

10        *v. Dept. of Soc. Servs.*, 436 U.S. 658 (1987).

11    - ***Against the city***: Ratification of officer conduct that deprived Paredes of his Fourth

12        Amendment Rights, in violation of 42 U.S.C. § 1983 and *Monell*.

13        Defendants initially argue that all of Paredes's claims fail because he cannot establish any

14    violation of his constitutional rights. The officer defendants separately argue that they are entitled

15    to qualified immunity whether or not Paredes's rights were violated. And the city argues that it is

16    entitled to summary judgment as to Paredes's failure to discipline claim.[2]

17                        **SUMMARY JUDGMENT LEGAL STANDARD**

18        Courts may grant summary judgment "if the movant shows that there is no genuine dispute

19    as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

20    56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a

21    verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A

22    dispute is material if it "might affect the outcome of the suit under the governing law." *Id.*

23        The moving party bears the initial burden to demonstrate a lack of genuine factual dispute.

24

25    ────────────────

26    [1] These three causes of action are Paredes's claims for: (1) failure to intervene, brought against
Hatzenbuhler, Alleman, and Nail; (2) municipal liability arising from a custom or practice (use of
force review), brought against the city, and (3) municipal liability arising from a custom or
practice (threat assessment), brought against the city.

27

28    [2] The city does not challenge Paredes's entitlement to proceed to trial on his ratification claim
should he avoid summary judgment on the underlying constitutional violations.

United States District Court
Northern District of California

1  *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). "When the nonmoving party has the burden of proof

2  at trial, the moving party need only point out 'that there is an absence of evidence to support the

3  nonmoving party's case." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting

4  *Celotex Corp.*, 477 U.S. at 325). To oppose summary judgment, the nonmovant "need not produce

5  evidence in a form that would be admissible at trial." *Curnow By and Through Curnow v.*

6  *Ridgecrest Police*, 925 F.2d 321, 323 (9th Cir. 1991) (citing *Celotex Corp.*, 477 U.S. at 324). "The

7  evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

8  favor." *Anderson*, 477 U.S. at 255. But where the record includes videotape evidence, the Court

9  "should … view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372,

10  381 (2007).

## ANALYSIS

### I.    Paredes may be able to establish a violation of his Fourth Amendment rights.

13         Section 1983 guards against the "[m]isuse of power, possessed by virtue of state law and

14  made possible only because the wrongdoer is clothed with the authority of state law." *Monroe v.*

15  *Pape*, 365 U.S. 167, 184 (1961) (internal citation omitted). The statute "imposes liability upon any

16  person who, acting under color of state law, deprives another of a federally protected right."

17  *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 624 (9th Cir. 1998). Although section

18  1983 "is not itself a source of substantive rights, [it] provides a method for vindicating federal

19  rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal citation

20  omitted). To prevail on a section 1983 claim, a plaintiff must therefore prove two elements: "(1)

21  the defendants acting under color of state law, (2) deprived plaintiffs of rights secured by the

22  Constitution or federal statutes." *Karim-Panahi*, 839 F.2d at 624.

23         Given the officer defendants' status as police officers, the parties do not dispute the first

24  element. To satisfy the second element, Paredes argues that Jeffrey's deployment of Tex and the

25  duration of Tex's bite amounted to either deadly or excessive force, and that Hatzenbuhler and

26  Alleman are liable as integral participants in Jeffrey's deployment of such force.

27         Claims of deadly and excessive force that "arise[] in the context of an arrest … [are] most

28  properly characterized as … invoking the protections of the Fourth Amendment" against

unreasonable seizures. *Graham*, 490 U.S. at 394 (citing *Tennessee v. Garner*, 471 U.S. 1 (1989)). Where a plaintiff alleges that additional officers were "integral participants" in the constitutional violation, the plaintiff must do more than show the officer was a "mere bystander," but need not go so far as to show "that each officer's actions themselves rise to the level of a constitutional violation." *Bonivert v. City of Clarkston*, 883 F.3d 865, 879 (9th Cir. 2018).

Defendants argue that the Court should view the use of the canine here as two separate events: first, Jeffrey's order to Tex to bite Paredes after he fell from the garbage can, and second, the duration of Tex's bite and the officer defendants' actions during the minute-long period in which Tex was attached to Paredes's neck. Where appropriate, the Court segments its analysis into these two categories. For the following reasons, the Court concludes that a jury could find for Paredes on both a use of deadly force and use of excessive force theory. Defendants therefore are not entitled to summary judgment on the ground that Paredes has not produced evidence sufficient to establish a violation of his constitutional rights.

### A.    Use of deadly force.

Paredes initially argues that Jeffrey's use of Tex amounted to deadly force that was deployed unreasonably under the circumstances of his arrest.

The Ninth Circuit's test for deadly force is set forth in *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) (en banc). In that case, the police responded to reports of domestic violence. Upon their arrival at Mr. Smith's home, he refused to surrender. The officers sprayed him "in the face with pepper spray," grabbed him from behind, "slammed him against the door," and "threw him down the porch[.]" *Id.* at 694. The officers also ordered a canine to bite him four times, once on his "right shoulder and neck area," once on his "arm," once on his "shoulder blade," and "once on his "buttock." *Id.* Smith argued that the officers' deployment of the canine constituted deadly force, and the Ninth Circuit held that the deadly force depends upon "whether the force employed creates a substantial risk of causing death or serious bodily injury." *Smith*, 394 F.3d at 706 (cleaned up). The court declined to determine "whether the use of a police dog to subdue a suspect constitutes deadly force," and instead left "to the district court the first opportunity to apply the concept to the facts of th[e] case." *Id.* at 707. The court emphasized that even though no prior case

had found that the use of a canine constituted deadly force, "we have never stated that the use of such dogs cannot constitute such force." *Id.* According to the Court, "[b]oth the nature and degree of physical contact and the risk of harm and the actual harm experienced are relevant" in analyzing the use of force. *Seidner v. de Vries*, 39 F.4th 591, 597 (9th Cir. 2022) (cleaned up and citations omitted).

Binding circuit precedents holds that the use of a canine to apprehend a suspect under the type of municipal protocols at issue here does not, standing alone, create a substantial risk of death. *See Smith*, 394 F.3d at 707 (citing *Kuha v. City of Minnetonka*, 365 F.3d 590, 598 n.3 (8th Cir. 2003) ("[T]he use of a properly trained police dog in the course of apprehending a suspect does not constitute deadly force.")). Because Paredes does not contend that the use of Tex was not subject to proper municipal protocols, the officers' initial deployment of Tex will be assessed below under the excessive force standard, rather than as a possible use of deadly force.[3]

The remaining question is whether the circumstances of Tex's bite, including its duration and the officers' actions while Tex was biting Paredes's throat, could amount to deadly force.

To support his deadly force argument, Paredes points to the following facts: Tex bit Paredes on the throat; Jeffrey pulled Tex's collar backwards against the bite, lifting Paredes off the ground by his throat; and as Tex thrashed about against Jeffrey's pull, his teeth tore into Paredes' throat and caused significant bleeding. The video evidence submitted by Paredes does not refute his recitation of the events. Paredes argues that these facts, coupled with the duration of the bite and the risk of asphyxiation attendant to the application of force to the throat, could lead a jury to conclude that the force applied constituted deadly force. Paredes further notes that an independent medical examiner concluded that Tex had fractured Paredes's right thyroid and left hyoid bones and his C5 vertebrae and had left him with wounds requiring sutures. Defendant's Expert Report from Dr. Damrose, M.D. ("Medical Report"), at 1, Dkt. No. 114-1, Exh. 24. Paredes has also

---

[3] Though the city's canine training protocols may support the position that Tex's initial deployment does not rise to the level of deadly force, Paredes may be able to rebut that inference with evidence demonstrating Tex's repeated failure to adhere to those proper training protocols prior to the events at issue here.

United States District Court
Northern District of California

1    submitted a report from expert Ernest Burwell in which Burwell states that "[a] review of the body

2    camera footage leaves little room for debate that this encounter could easily have resulted in [his]

3    death." Plaintiff's Expert Report from Ernest Burwell ("Burwell Report"), at 11, Dkt. No. 115,

4    Exh. A.[4]

5            Defendants make two primary arguments in response.

6            First, they argue that the undisputed evidence shows that Paredes did not suffer any life-

7    threatening consequences from the bite. This argument, however, misinterprets the deadly force

8    standard. While the extent of Paredes's injuries is relevant, *see Seidner*, 39 F.4th at 597 ("[T]he

9    actual harm experienced [is] relevant."), the essential focus of the inquiry is the *risk* posed by the

10   force used, which requires assessing the facts from the perspective of the police officers at the

11   time of the bite. *See Williams v. City of Sparks*, 112 F.4th 635, 643 (9th Cir. 2024) ("[T]he

12   reasonableness of a particular use of force must be judged from the perspective of a reasonable

13   officer on the scene, rather than with the 20/20 vision of hindsight.") (cleaned up). For example,

14   firing a gun at a person's head presents a substantial risk of death even if the bullet narrowly

15   misses. Tellingly, *Smith* thus excluded from the deadly force standard any requirement that the

16   force itself "result in serious bodily injury." *Smith*, 394 F.3d at 705. While defendants' evidence

17   regarding the extent of Paredes's injuries is relevant, it does not entitle them to summary

18   judgment.

19          Defendants next argue that Ninth Circuit cases applying the deadly force standard establish

20   as a matter of law that the force here was not deadly. In *Chew v. Gates*, 27 F.3d 1432, 1441 (9th

21   Cir. 1994), for example, the Ninth Circuit concluded that the use of a police dog amounted only to

22   "severe" force even though the canine dragged the plaintiff nearly ten feet and almost severed his

23   arm. In *Miller v. Clark*, 340 F.3d 959, 961–66 (9th Cir. 2003) the Ninth Circuit concluded that use

24   of a canine did not rise to the level of deadly force even though the minute-long bite reached the

25

26   ─────────────────────

27   [4] Defendants object to Paredes's reliance on this report, arguing that it would be inadmissible at
     trial. At least some of the statements set forth in the report, however, appear to constitute expert
     testimony, and defendants offer no specific arguments as to why Burwell is unqualified to offer

28   those opinions. To the extent the Court considers the Burwell report in this order, it does so only
     with respect to statements that may be admissible expert opinions.

*United States District Court*
*Northern District of California*

1    bone and "shredded" the plaintiff's muscles.

2        Defendants' reliance on *Miller* and *Chew* is misplaced because neither case applied the

3    deadly force standard set out in *Smith*. In *Chew*, the court expressly declined to consider whether

4    the "record sufficiently raises th[e deadly force] question": Having already found triable issues

5    with respect to the plaintiff's excessive force claim, the Court held that "the grant of summary

6    judgment must be reversed whether or not Chew adduced adequate evidence tending to show that

7    the considerable force used here was deadly." *Chew*, 27 F.3d at 1442; *see also id.* ("Judge Norris's

8    separate opinion rests on the conclusion that Chew has presented a genuine issue of material fact

9    with respect to whether the Los Angeles Police Department's use of dogs constitutes 'deadly

10   force.' He may well be right."). *Miller* is inapposite because it was decided before *Smith* and

11   employed a restrictive "deadly force" standard that was subsequently modified by the en banc

12   Ninth Circuit opinion in *Smith*. *See Miller*, 340 F.3d at 962 ("Deadly force means force reasonably

13   likely to kill.").

14       *Lowry v. City of San Diego*, 858 F.3d 1248 (9th Cir. 2017), another case defendants cite, is

15   also distinguishable. In *Lowry*, a police canine "bit Lowry's upper lip" while she slept on a couch.

16   *Id.* at 1254. The police "called [the dog] off very quickly after the initial contact with Lowry." *Id.*

17   at 1257. It is self-evident that the facts here are substantially different.

18       In short, none of the cases defendants cite involved factual circumstances as severe as

19   those here: a canine bite to the throat lasting over 60 seconds in which an officer pulled back on

20   the dog's collar, lifting the suspect off the ground by his throat. Defendants argue that Jeffrey's

21   attempts to remove Tex is an undisputed fact that should resolve the question of deadly force in

22   their favor, but Paredes characterizes Jeffrey's actions differently. To Paredes, Jeffrey's actions in

23   "yanking on the dog's collar" exacerbated the risk of deadly harm, threatening asphyxiation or

24   damage to a major artery. There is thus a material factual dispute about whether Jeffrey's actions

25   in pulling back on Tex's collar reduced or heightened the danger to Paredes. It may be reasonable

26   for Jeffrey to pull back on Tex's collar when Tex bites an arm or a leg, but Paredes disputes that it

27   was reasonable when doing so could have exacerbated his risk of death or serious bodily injury.

28   Such questions of reasonableness present quintessential disputes of fact not appropriate for

10

1    summary judgment.

2        If Jeffrey's actions amounted to deadly force, Jeffrey was entitled to use that force only if

3    it was "necessary to prevent the escape [of Paredes] and [Jeffrey] ha[d] probable cause to believe

4    that [Paredes] pose[d] a significant threat of death or serious physical injury to [Jeffrey] or others."

5    *Garner*, 471 U.S. at 3. The parties do not dispute that such circumstances were not present at the

6    time of Paredes's arrest.

7        Because there is a material dispute as to whether Jeffrey's actions rose to the level of

8    deadly force, defendants are not entitled to summary judgment on the ground that the undisputed

9    evidence precludes any jury from finding a violation of Paredes' Fourth Amendment rights.

10       **B.    Use of excessive force.**

11       The preceding discussion is sufficient to require the denial of defendants' motion to the

12   extent it is premised on their assertion that Paredes cannot establish any constitutional violation.

13   But Paredes also argues that both the initial deployment of Tex and the duration of his bite

14   involved excessive force sufficient to establish a violation of his Fourth Amendment rights

15   whether or not that force was deadly.

16       As noted already, excessive use of force claims arise under the Fourth Amendment's

17   prohibition against unreasonable seizures. *Graham*, 490 U.S. at 394. The Fourth Amendment's

18   reasonableness inquiry "in an excessive force case is an objective one." *Id.* Courts ask "whether

19   the officers' actions are 'objectively reasonable' in light of the facts and circumstances

20   confronting them, without regard to their underlying intent or motivation." *Id.* Courts should not

21   view the officers' actions "with the 20/20 vision of hindsight" but must instead consider "the fact

22   that police officers are often forced to make split-second judgments." *Williams*, 112 F.4th at 643.

23       The Ninth Circuit employs a three-step inquiry to evaluate excessive force claims. *See*

24   *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). The first step "assess[es] the

25   severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and

26   amount of force inflicted." *Id.* (internal citation omitted). Even when officers are justified in using

27   some force, the amount actually used "may be excessive." *Id.* Second, courts assess the

28   government's interest in using that force. *Id.* (internal citation omitted). The third step balances the

United States District Court
Northern District of California

factors considered at the first and second steps, weighing "the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* (internal citation omitted). Excessive use of force cases "nearly always require[] a jury to sift through factual contents" and, as a result, summary judgment in such cases "should be granted sparingly." *Id.* (quoting *Smith*, 394 F.3d 701).

### i.    Severity of the intrusion

In assessing the level of force used, courts "assess both 'the risk of harm and the actual harm experienced.'" *Sabbe v. Washington Cnty. Board of Comm'rs*, 84 F.4th 807, 821 (9th Cir. 2023) (quoting *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012)). Neither party meaningfully disputes that this factor favors Paredes.[5] For the same reasons discussed above in finding a triable issue as to whether deadly force was used, a jury could find that the use of the canine here involved substantial force resulting in a severe intrusion. *See, e.g.*, *Miller*, 340 F.3d at 962 (canine bite lasting one minute constitutes "serious" intrusion).

### ii.    Governmental interest

"The greater the risk of harm and the actual harm involved, the greater the governmental interest must be to justify the use of force." *Sabbe*, 84 F.4th at 821. Courts in the Ninth Circuit use a three-step approach to evaluate the strength of the government's interest in using force: "(1) 'whether the suspect poses an immediate threat to the safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Glenn*, 673 F.3d at 872 (quoting *Graham*, 490 U.S. at 396).

### 1.    Threat to officer safety

Whether an arrestee poses an immediate threat to officer safety is "the most important" factor in evaluating the government's interest. *Id.* The Ninth Circuit's decisions in *Miller* and *Lowry* provide guidance as to the circumstances in which suspects pose a threat to officers sufficient to justify the deployment of a police dog.

In *Miller*, an officer pulled over driver James Miller on suspicion of a traffic violation.

---

[5] Defendants primarily argue that the use of force did not amount to deadly force.

United States District Court
Northern District of California

*Miller*, 340 F.3d at 960. Miller fled from police onto his "parents' large rural property," which was covered in "dark, wooded terrain." *Id.* at 960–61. Unable to find Miller, the officers released a canine to apprehend him. Upon finding Miller, the dog bit his upper arm for a full minute causing "severe injury" and shredding his skin and muscles "as deep as the bone." *Id.* at 961. The Ninth Circuit concluded that the threat to officer safety was "immediate" for several reasons. *Id.* at 965. First, the officer "did not know where within those woods Miller was hiding." *Id.* The woods were dark and "strewn with … unseen obstacles obscured by darkness." *Id.* (cleaned up). Second, unlike the officers, "Miller … was familiar with the terrain." *Id.* Third, the officer did not know if Miller was armed but had previously seen a "seven or eight-inch knife on the [car's] seat." *Id.* at 960. Fourth, Miller had "ignored [the officer's] warning that he was about to release a police dog." *Id.* at 965. Under these circumstances, the Ninth Circuit concluded that Miller "possess[ed] a strategic advantage over the deputies, … [which] entitled [the officer] to assume that Miller posed an immediate threat." *Id.*

In *Lowry*, the plaintiff had returned to her office after a night out drinking with her friends and "accidentally triggered the alarm before falling asleep on the couch." *Lowry*, 858 F.3d at 1253. Police entered the building, suspecting "that a burglary might be in progress and that the intruder could be lying in wait." *Id.* After calling for surrender and hearing no response, the police warned that they had a police dog. *Id.* They released the dog, which found Lowry asleep on the couch and bit her lip. *Id.* at 1254. The Ninth Circuit held that "from the perspective of the officers[, ]they were justified in believing that the threat to officers was immediate." *Id.* at 1258. The officers were responding to a burglary alarm and thus believed that the person might be armed. *Id.* They entered a "dark commercial building [with] an open door." *Id.* Nobody responded to their warnings. Citing *Miller*, the Court stated that because the officers believed the suspect "was hiding," may have been "armed," and did not respond to "the officer's warning," "similarly 'objectively menacing circumstances' existed [in *Lowry*]." *Id.*

Defendants contend the circumstances here are indistinguishable from those presented in *Miller* and *Lowry*. There are, however, at least three disputed factual questions that preclude granting summary judgment on that ground.

1        First, a jury could find that that it was unreasonable for the officers to believe that Paredes

2    posed a threat of violence. To be certain, two of the officer defendants have submitted declarations

3    in which they stated their belief that Paredes had threatened "to cut" the Safeway security guard

4    and that he was armed with a "bladed weapon." Hatzenbuhler Decl. ¶¶ 19, 24; Jeffrey Decl. ¶ 9.

5    Hatzenbuhler claims to have been told this by Sergeant Jantz. Hatzenbuhler ¶¶ 19, 32. But Jantz's

6    basis for these claims appears nowhere in the record or in any of the video footage of the incident.

7    To the contrary, the officers' declarations are undercut by both the 911 call and dispatch audio,

8    which reported an unarmed robbery. Given the absence of corroborating evidence, a jury would be

9    entitled to discredit the officers' testimony. *See Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th

10   Cir. 2017) (recognizing that courts need "not simply accept what may be a self-serving account by

11   the police officer" at summary judgment) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.

12   1994)).

13       The defendants also rely upon allegations that Paredes had used a bottle to smash the

14   security guard over the head. But this allegation is also contradicted by the dispatch's initial report

15   that "two females" had attempted to hit the guard with a bottle. And though dispatch later

16   corrected this transmission, the video evidence and subsequent testimony do not eliminate any

17   factual disputes. For example, the video footage shows a conversation between Alleman and

18   Jeffrey in which Alleman states that he believed Paredes to be armed with a bottle. Alleman also

19   says, however, "I'm pretty sure. Let me lock that down since I'm selling it on people here."

20   Alleman body worn camera footage ("BWC"), 34:19–34:35. The officers also point to their

21   knowledge of a prior armed robbery connected to Paredes's vehicle. But as Paredes points out, the

22   dispatch audio had advised them that in the prior incident "a Hispanic female" had used pepper

23   spray. Disp. Transcript 125–26. Finally, the officers point to allegations that Paredes had sought to

24   break into private homes throughout his flight. Though dispatch reported possible break-ins at

25   private residences, dispatch never identified Paredes as the suspect, Dispatch Audio 269–71, and

26   Paredes maintains that he never attempted to break into private residences. Paredes Dep. 104:24–

27   105:5.

28       Unlike in *Miller* where an officer had seen a "seven or eight-inch knife on the [car's] seat,"

United States District Court
Northern District of California

United States District Court
Northern District of California

1    340 F.3d at 960, there is significant uncertainty as to whether it was reasonable for the officers to

2    believe that Paredes was armed. This question of fact must be resolved by the jury.

3         Second, there is a material factual dispute as to whether Paredes had surrendered by the

4    time that Jeffrey ordered Tex to bite. Defendants acknowledge that Paredes yelled "Alright!

5    Alright!" immediately prior to Jeffrey's command to Tex to bite but argue that it was impossible

6    for the officers to hear Paredes given the helicopter circling overhead. This may be true, but the

7    video footage does not "blatantly contradict[]" Paredes's account. *Rosenbaum v. City of San Jose*,

8    107 F.4th 919, 922 (9th Cir. 2024) (quoting *Scott*, 550 U.S. at 381). His cries are audible on the

9    body worn camera footage of all five arresting officers. Thus, unlike in *Miller* and *Lowry* where

10   neither suspect responded to police calls to surrender, a reasonable jury could find that Paredes's

11   yells of "Alright! Alright!" were a clear attempt to surrender heard by the officers.

12        Defendants' reliance on *Hernandez v. Town of Gilbert*, 989 F.3d 739 (9th Cir. 2021), to

13   minimize the significance of Paredes's cries is also unavailing. In *Hernandez*, the Ninth Circuit

14   held that a suspect's utterance of "alright" was not a clear indication of surrender. *Id.* at 747. But

15   in that case, the suspect also physically resisted the officers. He ignored "uses of lesser force" and

16   five separate warnings that the officers might use a canine. Eventually, the officers had to

17   "physically drag him from his car." *Id.* at 746.

18        By contrast, the helicopter here only called on Paredes to surrender twice, and the officers

19   themselves did not announce their presence or warn that use of a dog was imminent. And in any

20   event the *Hernandez* court limited its holding to the circumstances presented by Hernandez's

21   "continuing resistance" and stated that "'alright' could possibly constitute submission to the

22   authorities under other circumstances." *Id.* at 747. A jury could conclude that at the point Jeffrey

23   deployed Tex, a reasonable officer should have understood that Paredes's cries of "Alright!

24   Alright!" constituted surrender.

25        Third, a jury could find that Jeffrey's decision to order Tex to bite was unreasonable under

26   the circumstances. The officers testified that they believed Paredes chose to hide in the trash can

27   so that he could lie in wait and ambush them as they approached. To the defendants, this makes

28   the circumstances analogous to *Miller* and *Lowry*. But those cases involve critical factual

differences from the facts here.

In *Miller*, the suspect "possess[ed] a strategic advantage over the deputies" because he hid in a vast, wooded area with which he was intimately "familiar" (unlike the officers). *Miller*, 340 F.3d at 960. Miller also could have continued to flee through the woods. *Id.* By contrast, Paredes lacked familiarity with the relatively small, confined space of the backyard, and once the officers surrounded him he had nowhere to go.

In *Lowry*, the officers had no knowledge of the plaintiff's whereabouts and ultimately sent the dog into a dark room through an open door. *Lowry*, 858 F.3d at 1258**.** Here, the officers knew exactly where Paredes was hiding. The helicopter confirmed his location, and Tex alerted on the trash can before the officers toppled it. The video footage shows all but one officer holstering their firearms upon approaching the trash can, evidence from which a jury could infer that the officers did not expect an ambush.

*Miller* and *Lowry* are therefore best understood as involving the use of a canine to "find and bite." At the time Jeffrey deployed Tex, the officers had already found Paredes, and Tex's only purpose was to bite. From these facts, a jury could conclude that Paredes did not possess "a strategic advantage over the deputies" that "entitled [them] to assume that [Paredes] posed an immediate threat." *Miller*, 340 F.3d at 965. A jury could therefore conclude that the Jeffrey's decision to order Tex to bite was unreasonable.

Because there are at least three disputes of material fact bearing on the degree to which the officers reasonably believed Paredes posed a threat at the time of Tex's deployment, a reasonable jury could find on the basis of the evidence in the record that Paredes did not pose an immediate threat to officer safety.

## 2. Severity of the Crime

Paredes concedes that this factor favors defendants because his involvement in a robbery constituted a "serious" crime. How heavily this should weigh in favor of the defendants, however, depends upon whether the officers had a reasonable belief that Paredes was armed. As discussed above, the parties dispute whether the officers' reported belief that Paredes was armed was reasonable. Should a jury conclude that a reasonable officer would have understood Paredes to be

unarmed, this factor would favor the defendants but with significantly less weight.

### 3.    Active Resistance

The final factor in the *Graham* analysis is whether Paredes was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. How heavily this factor should weigh for the defendants requires an assessment of whether Paredes's resistance was active or passive. The Ninth Circuit has held that "hiding" from officers can constitute active resistance. *Miller*, 340 F.3d at 965–66 ("Although Miller had paused while hiding in the woods at the time of his arrest, Miller was still evading arrest by flight."). But this Circuit has also found it reasonable to give only "a slight edge" to the government on this factor where the suspect had paused in their flight for over an hour prior to the use of a canine. *Chew*, 27 F.3d at 1442. And where a suspect only passively resists arrest, this factor will only slightly favor the defense. *See Koistra v. Cnty. of San Diego*, 310 F. Supp. 3d 1066, 1079 (S.D. Cal. 2018) ("Because Fay and Koistra were passively resisting by hiding, this factor slightly favors the County.").

Neither party disputes that at the time of his arrest, Paredes was hiding from the police in a garbage can; that he had heard and understood the two helicopter announcements, calling on him to surrender, Paredes Dep. 107:16–108:16; 109:12–110:5; 111:4; or that his "main objective [was] to run and hide," *id.* at 99:15–16. Defendants argue this is sufficient to establish active resistance. But the parties also do not dispute that Paredes's flight had ended at the time of the arrest. At that point, the officers had surrounded his position while failing to announce their presence. Upon becoming aware of their presence, Paredes yelled "Alright! Alright!" Paredes argues that because he attempted to surrender and did not physically resist arrest, his resistance should be viewed only as passive resistance. And because the "video [evidence] does not clearly contradict [Paredes's] account," the court must credit it for the purposes of summary judgment. *Rice v. Morehouse*, 989 F.3d 1112, 1123 (9th Cir. 2021) ("We have long distinguished between passive and active resistance"). Should a jury conclude that Paredes was only passively resisting arrest, this factor would only slightly favor defendants.

### iii.    Balancing

As discussed above, the severity of the intrusion factor clearly favors Paredes and whether

United States District Court
Northern District of California

it rose to the level of deadly force remains in dispute. Applying the required balancing analysis, the Court cannot conclude that any governmental interest necessarily justified the use of such force. The evidence before the Court would permit a jury to conclude that a reasonable officer would not have perceived an immediate threat and that the second two factors weigh only slightly in the defendants' favor.

Accordingly, there are disputes of material fact sufficient for a jury to conclude that Jeffrey's use of Tex to apprehend Paredes amounted to excessive force and that the duration of Tex's bite amounted to either deadly or excessive use of force, both in violation of his Fourth Amendment right to be free from unreasonable seizures.

### C.    Hatzenbuhler and Alleman

Because Jeffrey deployed Tex, Jeffrey is directly responsible for the potentially unconstitutional uses of force discussed above and is not entitled to summary judgment on the ground that Paredes cannot establish a Fourth Amendment violation. Because Hatzenbuhler and Alleman were not handling Tex, however, they are potentially liable only if they were "integral participants" in a violation of Paredes's Fourth Amendment rights.

To prevail on this theory, Paredes must do more than show that Hatzenbuhler and Allman were present at his arrest, *see Jones v. Williams*, 297 F.3d 930, 935–36 (9th Cir. 2002), but their actions need not themselves "rise to the level of a constitutional violation." *Bonivert*, 883 F.3d at 879 (citing *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004)). Instead, integral participant liability arises where "(1) the defendant knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted" excessive force, or (2) the defendant "set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury." *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022).

Alleman and Hatzenbuhler's actions are undisputed. Hatzenbuhler attempted to shove over the trash can with a broom and, when that was unsuccessful, Alleman used his bare hands to tip the trash can to the ground revealing Paredes's head and neck to Tex. While Tex bit Paredes's neck, Alleman pointed his gun at Paredes and stood on Paredes's right hand. In that same time

United States District Court
Northern District of California

period, Hatzenbuhler held Paredes's right hand in an arm lock and, at various points, stood on his head. The video evidence shows Hatzenbuhler telling Jeffrey to remove Tex from the bite and Alleman attempting to activate Tex's e-collar.

As to the initial apprehension, Paredes has identified facts sufficient for a reasonable jury to find that Alleman and Hatzenbuhler knew that toppling the can could result in a bite to Paredes's neck. Both officers testified that based on Paredes's position in the can they expected Tex to bite somewhere on the upper half of his body, including Paredes's head or neck. Hatzenbuhler Dep. 235:3–20; Alleman Dep. 154:22–155:10. Both officers were part of the canine arrest team and had participated in canine-involved arrests on prior occasions. And both officers' testimony could support the inference that Hatzenbuhler and Alleman's attempts to push over the trash can were made not for the purpose of handcuffing Paredes but rather to reveal him so that Jeffrey could command Tex to bite.

Thus, viewed in the light most favorable to Paredes, Hatzenbuhler and Alleman's attempts to topple the garbage "set in motion a series of acts" resulting in Paredes's constitutional harm. *Peck*, 51 F.4th at 891. Their testimony as to their knowledge of where Tex would bite, coupled with their actions in pushing over the can, could lead a jury to conclude that they had devised a "common plan" that resulted in Paredes's injury. *Id.*

As to the duration of the bite, defendants argue that the officers' actions were intended to hold Paredes still so that Jeffrey could remove Tex from his throat. Paredes responds that Hatzenbuhler and Alleman simply restrained Paredes to allow Tex to continue biting his throat.

The Ninth Circuit has recognized that where one officer retrains a suspect "and, thus, facilitated another officer's subsequent unlawful act," that officer can be held liable as "an integral participant in that use of force." *Peck*, 51 F.4th at 890 (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, at 481 n.12 (9th Cir. 2007)); *see also Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1051 (9th Cir. 2014) ("[Plaintiff's] assertion of excessive force is not premised solely on the pointed weapons but also on the fact that she was held at gunpoint while she was otherwise restrained [by the integral participant officer]."). The record before the Court demonstrates a dispute of material fact as to whether Hatzenbuhler and Alleman facilitated the lengthy duration of

Tex's bite. On the one hand, the video footage shows Hatzenbuhler ordering Jeffrey to remove Tex and Alleman reaching to Jeffrey's vest to activate the e-collar. But the video evidence also clearly shows the officers restraining Paredes while Tex continued to tear at his throat. Alleman stood on Paredes's hand with his gun drawn, and Hatzenbuhler restrained Paredes's arm and stood on his head at times. And though the video evidence shows the officers repeatedly yelling "do not fight the dog," the video footage generally shows that Paredes was not resisting Tex. From this evidence, a jury could conclude that Hatzenbuhler and Alleman's actions served only to restrain Paredes while Jeffrey continued to allow Tex to bite.

Accordingly, Hatzenbuhler and Alleman are not entitled to summary judgment on the ground that Paredes cannot establish their liability as "integral participants" in a violation of his Fourth Amendment rights.

## II.    Paredes may be able to establish that the officers are not entitled to qualified immunity.

Although Paredes has shown that a jury could find a violation of his Fourth Amendment rights, the officer defendants can nonetheless prevail on summary judgment if the undisputed facts demonstrate that they are entitled to qualified immunity.

Qualified immunity shields state and local officials from 1983 liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Devereaux*, 263 F.3d at 1074 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome this immunity, a plaintiff must prove both "that (1) the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The reasonableness of the officers' conduct is assessed against "the backdrop of the law at the time" of the alleged violation. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). "Law enforcement officers 'are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.'" *Rosenbaum*, 107 F.4th at 924 (quoting *Kisela*, 584 U.S. at 104). There need not be a Supreme Court or circuit court case directly on point, but the caselaw "must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 79

United States District Court
Northern District of California

1    (2017)). An officer violates a clearly established right where "the right's contours were

2    sufficiently definite that any reasonable official in the defendant's shoes would have understood

3    that he was violating it." *Kisela*, 584 U.S. at 105 (internal citation omitted). "[D]isputed factual

4    issues that are necessary to a qualified immunity decision … must first be determined by the jury

5    before the court can rule on qualified immunity." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1140

6    (9th Cir. 2019) (internal citation omitted).

7        **A.    Jeffrey**

8        Defendants argue that Jeffrey is entitled to qualified immunity because, at the time of the

9    bite, no existing caselaw demonstrated that either his initial apprehension of Paredes or the

10    duration of the bite violated Paredes's Fourth Amendment rights.

11        As to the initial apprehension, Jeffrey is not entitled to qualified immunity because the

12    Ninth Circuit has clearly established that "continued force against a suspect who has been brought

13    to the ground" and is no longer a threat to officer safety can amount to a constitutional violation.

14    *Zion*, 874 F.3d at 1076 (citing *Drummond v. City of Anaheim*, 343 F.3d 1052, 1057–58 (9th Cir.

15    2003)). Three Ninth Circuit cases demonstrate this principle in the context of canine deployment.

16        In *Mendoza v. Block*, 27 F.3d 1357, 1358 (9th Cir. 1994), the plaintiff fled from police

17    after robbing a bank. He "crawled under some bushes on private property and hid." *Id.* After

18    several hours, police released a canine to find Mendoza. *Id.* Upon finding Mendoza, the dog "bit

19    down on his right arm and pulled him out of the bushes." *Id.* While Mendoza lay face down on

20    the ground, the dog bit his other side. *Id.* When he called for police to pull the dog off him, the

21    officers told Mendoza to "shut [his] fucking mouth." *Id.* The Ninth Circuit held that "excessive

22    force has been used when a deputy sics a canine on a handcuffed arrestee who has fully

23    surrendered and is completely under control." *Id.* at 1362.

24        In *Chew*, police pursued a fleeing suspect into a junkyard, where he hid for over an hour.

25    The officers deployed the canine only when Chew was "completely surrounded by the police" and

26    his capture was "imminent." *Chew*, 27 F.3d at 1443. The Ninth Circuit held that the use of the

27    canine in this instance could rise to the level of excessive force.

28        Finally, *Smith* put the officers on notice that use of a canine against a suspect who poses no

United States District Court
Northern District of California

threat to officers violates the Fourth Amendment. Recall that in *Smith*, the officers sprayed Smith with pepper spray, "slammed him against the door, and threw him down on the porch," *Smith*, 394 F.3d at 694, and then deployed the canine to bite Smith four times. According to the Ninth Circuit, there was at that point no "reason to believe that [Smith] possessed any weapon or posed any immediate threat to the safety of the officers or others." *Id.* 702. The Ninth Circuit declined to grant qualified immunity to the officers because "the use of a police canine and pepper spray could, under clearly established law, have constituted the use of excessive force." *Id.* at 704 n.7 (citing *Mendoza*, 27 F.3d at 1362 ("[E]xcessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control.")).

District courts have applied these principles in circumstances comparable to this case. In *Burns v. City of Concord*, No. 14-cv-00535-LB 2017 WL 5751407, at *13 (N.D. Cal. Nov. 28, 2017), for example, an officer deployed a canine to bite a suspect after the arresting officers had shot the suspect multiple times. *Id.* Although the officer defendants here had not physically incapacitated Paredes prior to the bite, the court in *Burns* focused on the fact that the suspect "no longer posed a threat" because the officers had "already approached and surrounded [him] with their guns drawn." *Id.* Because a jury could conclude that the suspect no longer posed a threat at the time of canine deployment, the officer defendants in *Burns* were not entitled to a qualified immunity defense. *See also, e.g.*, *Gabriel v. Cnty. of Sonoma*, —F. Supp. 3d— 2024 WL 1329913 (N.D. Cal. Mar. 27, 2024) ("[I]t was unreasonable to deploy a dog to bite a passively resistive suspect who is in a position of surrender and surrounded by armed officers"); *Rodriguez v. City of West Covina* No. 17-138-CBM-JC 2018 WL 625252487 (C.D. Cal. Jun. 14, 2018) ("Officer Miller would have been on notice that the use of force (i.e., deployment of the canine) against Plaintiff was clearly unlawful if Plaintiff had surrendered and was no longer an immediate threat to officers or others."); *Sweiha v. Cnty. of Alameda*, No. 19-cv-03098-LB 2021 WL 292517 (N.D. Cal. Jan. 28, 2021) ("Mr. Sweiha contends that the dog bit him only after he surrendered and only after [the officer] positioned the dog on him so that he would bite him.").

Considering the facts in dispute here and drawing inferences in Paredes's favor, a jury could find that Paredes no longer posed a threat to the officers at the time of Tex's deployment.

1   Although the officers stated in their declarations that they believed Paredes was armed with some

2   sort of bladed weapon, the video footage shows only Alleman stating a belief that Paredes might

3   be armed with a bottle. Alleman BWC, 34:19–34:35. The 911 and dispatch transcript both confirm

4   that the officers were told that Paredes was unarmed. And at the time that Paredes yelled "Alright!

5   Alright!", five officers surrounded him, one of whom had a gun in his hand. Paredes claims that he

6   attempted to surrender, and the video evidence does not clearly refute his account. Drawing all

7   factual inferences in Paredes's favor, a jury could conclude that at the time Jeffrey deployed Tex, a

8   reasonable officer in his position would have understood Paredes to be unarmed, of minimal

9   threat, and attempting to surrender. Existing caselaw clearly established at the time of the bite that

10  the initial deployment of a canine in such circumstances violates the Fourth Amendment.

11      Jeffrey is also not entitled to qualified immunity as to the bite's duration because, "[i]n the

12  particularized context of the use of police canines, [the Ninth Circuit] held more than twenty years

13  ago that 'it was clearly established that excessive duration of a canine bite or improper

14  encouragement of a continuation of an attack by officers could constitute excessive force that

15  would be a constitutional violation." *Hartsell v. Cnty. of San Diego*, 802 Fed. Appx. 295, 296 (9th

16  Cir. 2020) (quoting *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1093 (9th Cir. 1998))

17  (cleaned up). The Ninth Circuit's recent decision in *Rosenbaum v. City of San Jose*, is instructive.[6]

18  In that case, the Ninth Circuit held that "[a] police officer violates the Fourth Amendment when he

19  or she allows a police dog to continue biting a suspect who has fully surrendered and is under

20  officer control." *Rosenbaum*, 107 F.4th at 924. In reaching its holding, the court relied principally

21  on two prior Ninth Circuit cases, *Watkins* and *Miller*. As previously discussed, in *Miller* the

22  arresting officers sent a dog into a dark and densely wooded property to find and bite the suspect.

23  *Miller*, 340 F.3d at 960–61. The court concluded that use of the canine was not excessive because

24  the officer had "commanded [the dog] to release Miller as soon as [the officer] determined that

25

26  _____

27  [6] Although *Rosenbaum* was decided after the events in this lawsuit, the underlying events
    preceded the arrest of Paredes. Accordingly, the law upon which the Ninth Circuit relied in
    *Rosenbaum* was part of "the backdrop of the law at the time" of Paredes's arrest. *Kisela*, 584 U.S.

28  at 104.

United States District Court
Northern District of California

Miller was unarmed," *id.* at 967 n.12, "and the dog promptly complied." *Id.* at 961. *Miller* thus

established that "an officer does not act unreasonably in deploying a police dog to detain a suspect

where the officer releases the dog from its bite as soon as he determines that the suspect is

unarmed" and the dog promptly complies. *Rosenbaum*, 107 F.4th at 925 (citing *Miller*, 340 F.3d at

960–61).

In *Watkins*, the plaintiff hid from police in a commercial warehouse in Oakland. The

officers sent a canine into the warehouse and, after locating Watkins, the dog bit him. *Watkins*,

145 F.3d at 1091. The officers did not call off the canine and instead ordered Watkins to show his

hands. *Id.* Watkins was unable to comply because the dog continued to bite him. *Id.* After the

officer pulled Watkins out of the car, the officers allowed the dog to continue to bite him. *Id.* The

dog bit Watkins for a "period [of] about thirty seconds." *Id.* The Ninth Circuit held "that it was

clearly established that excessive duration of the bite and improper encouragement of a

continuation of the attack by officers could constitute excessive force that would be a

constitutional violation." *Id.* at 1093. Notably, while *Watkins* spoke of "improper encouragement,"

the officers in that case had not affirmatively encouraged the canine to continue biting but instead

merely "delay[ed] in calling off [the canine]" while Watkins "was obviously helpless and

surrounded by police officers with their guns drawn." *Id.* at 1090. *Watkins* thus clearly established

"that an officer violates clearly established law by allowing a police dog to continue biting a

suspect after the suspect's surrender, even when the suspect is not handcuffed." *Rosenbaum*, 107

F.4th at 924–25 (citing *Watkins*, 145 F.3d at 1090, 1093).

*Miller* and *Watkins* put the officer defendants on notice that the duration of Tex's bite

alone could subject them to liability. To be certain, these cases often measured the "excessive

duration" of a dog bite from the point at which the officers ordered the dog to stop biting.[7] But

*Miller* held that the officer did not use excessive force in part because "the dog promptly

complied" with the command to release. *Miller*, 340 F.3d at 961. That is plainly not the case here.

---

[7] *Watkins* discussed the "delay in calling off [the canine]," 145 F.3d at 1090, and *Miller* found no excessive duration because the officer called off the dog "as soon as he determine[d] that the suspect [was] unarmed." 340 F.3d at 960–61.

United States District Court
Northern District of California

While the video evidence shows that Jeffrey attempted to release Tex by yelling "out" within 20 seconds of the initial bite, by attempting to activate a faulty e-collar, and by pulling on Tex's collar, Tex did not "promptly compl[y]" with any of these commands. *Miller*, 340 F.3d at 961.

The Court need not determine at this time whether an officer whose unsuccessful but good faith efforts to release a canine from a suspect would be entitled to qualified immunity for a claim arising from the bite's continuation following those failed efforts, because the evidence before the Court establishes a material dispute of fact regarding the nature of Jeffrey's actions. The video footage shows Jeffrey lifting Tex while the dog remained attached to Paredes's throat, jerking Tex back and forth, and holding Tex with only one hand. In Paredes's view, these actions only exacerbated and prolonged the duration of the bite. Whether Jeffrey believed in good faith that his efforts would result in Tex's release is also disputed. Jeffrey states in his sworn declaration, and counsel repeat in their briefs, that Jeffrey did not know that Tex might fail to release given that he had "never failed to release a bite in the field." Defendants' Motion for Summary Judgment, Dkt. No. 108, at 13, 18; *see* Jeffrey Decl. ¶¶ 8, 18. But Paredes has submitted six body worn camera videos taken prior to Paredes's arrest that show Tex failing to respond to a total of twenty-two verbal outs, multiple manual outs, and at least one use of the e-collar while Jeffrey was Tex's handler. This evidence would support an inference that Jeffrey knew that Tex could or would fail to release when commanded, and that his efforts to release Tex were therefore not taken in good faith.

From this evidence, a jury could also conclude that it was unreasonable for Jeffrey to pull back on Tex's collar once he understood that Tex had clamped down on Paredes's throat. Existing caselaw put Jeffrey on notice that the severity of the intrusion upon Paredes's Fourth Amendment rights would only be "exacerbated by the duration of [Tex's] bite." *Miller*, 340 F.3d at 964; *see* *Watkins*, 145 F.3d at 1090; *Smith*, 394 F.3d at 702, 703–04 (finding that "the effect of the pepper spray was exacerbated" when used in Smith's dog bite wounds and concluding that a jury could find such actions unreasonable). Such "factual disputes . . . as to the objective reasonableness of an officer's conduct . . . cannot be resolved at summary judgment on qualified immunity grounds." *Rosenbaum*, 107 F.4th at 924 (9th Cir. 2024).

1    For these reasons, Jeffrey is also not entitled to summary judgment on qualified immunity

2    grounds.

3    **B.    Hatzenbuhler and Alleman**

4    It is unclear whether district courts must conduct a separate qualified immunity analysis

5    with respect to each officer alleged to have been an integral participant in the violation of a clearly

6    established constitutional right—in other words, whether an officer sued on an integral

7    participation theory is entitled to qualified immunity unless precedent clearly establishes both that

8    the plaintiff's constitutional rights were violated *and* that the officers' conduct could subject them

9    to integral participant liability for that violation. The Ninth Circuit frequently, though not always,

10   conducts its qualified immunity analysis without separating out the integral participants. *See, e.g.*,

11   *Reynaha Hernandez v. Skinner*, 969 F.3d 930, 943–44 (9th Cir. 2020); *Blankenhorn*, 485 F.3d at

12   481 n.12; *Dahlin v. Frieborn*, 859 Fed. Appx. 69, 71 (9th Cir. 2021); *but see Sweet v. Langley*,

13   798 Fed. Appx. 135 (9th Cir. 2020).

14   Assuming that such an analysis is necessary, clearly established caselaw at the time of

15   Paredes's arrest put Hatzenbuhler and Alleman on notice that their conduct could make them

16   integral participants. In *Blankenhorn*, for example, the Ninth Circuit held that officer who placed

17   rip-hobbles on a suspect while other officers punched that suspect was an integral participant.

18   *Blankenhorn*, 485 F.3d at 481 n.12. This allowed other officers to gain control over the suspect

19   and then to punch him repeatedly while he was otherwise restrained.

20   When the facts here are viewed in the light most favorable to Paredes, Hatzenbuhler and

21   Alleman similarly restrained Paredes while Tex bit at his throat at Jeffrey's command. Though

22   Hatzenbuhler and Alleman did not use rip-hobbles and Jeffrey did not use his fists, the three

23   officers' behavior is sufficiently analogous to the behavior in *Blankenhorn* to preclude summary

24   judgment on qualified immunity grounds: The officers were on notice that restraining a non-

25   resisting suspect while that suspect was subjected to excessive use of force could expose them to

26   integral participant liability. *See Green*, 751 F.3d at 1051 (holding that "restraining" a suspect

27   while other officers pointed their guns at that suspect, thus engaging in excessive use of force,

28   gives rise to integral participant liability). The Ninth Circuit has also clearly established that an

United States District Court
Northern District of California

26

1   officer providing armed backup to another officer's unconstitutional use of force, as Alleman may

2   have done here, can be held liable as an integral participant in the underlying violation of an

3   individual's rights. *See Boyd*, 374 F.3d at 380.[8]

4       Because there exists a material dispute of fact as to whether Alleman and Hatzenbuhler's

5   actions involved restraining Paredes to allow Jeffrey to engage in an excessive use of force, and

6   because clearly established caselaw established that officers can be held liable as integral

7   participants under analogous circumstances, Alleman and Hatzenbuhler are also not entitled to

8   summary judgment on qualified immunity grounds.

9   **III.    The city's liability**

10       To establish municipal liability under § 1983, a plaintiff must do more than demonstrate

11   "an injury inflicted solely by [the city's] employees or agents." *Monell*, 436 U.S. at 694. Instead,

12   the plaintiff must additionally show that their constitutional injury was a product of the

13   "government's policy or custom." *Id.* Municipalities may be held liable for officer misconduct in

14   three circumstances: (1) "when implementation of its official policies or established customs

15   inflicts the constitutional injury," (2) for "acts or 'omission[s]' … [that] amount to the local

16   government's own official policy," or (3) when the "final policy-making authority … ratified a

17   subordinate's unconstitutional decision or action and the basis for it." *Clouthier v. Cnty. of Contra*

18   *Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010) (internal citations omitted), *overruled in part on*

19   *other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016).

20       Paredes claims that the city is liable under two theories: (1) for failing to discipline Jeffrey

21   in prior instances in which he deployed a canine in a similar manner, and (2) for having ratified

22   the conduct of the officer defendants. With respect to the second theory of liability, the city

23   contends only that Paredes cannot show any violation of his constitutional rights. As previously

24

25   ────────────

26   [8] In support of their contrary argument, defendants rely on a district court opinion and a nonprecedential affirmance of that opinion. *See Rock v. Cummings*, No. CV 20-01837 2023 WL 4315222 (D. Ariz. July 3, 2023), *aff'd sub nom. Rock v. Miller*, Nos. 23-16009, 23-16059 2024

27   WL 3811396 (9th Cir. Aug. 14, 2024). But the Court interprets the applicable precedents differently than the Arizona district court, and the Ninth Circuit's nonprecedential order merely

28   affirmed the decision below without expressly adopting its reasoning.

United States District Court
Northern District of California

1  discussed, however, a reasonable jury could find that Jeffrey's use of force was unconstitutional.

2  The city's motion judgment for summary judgment is therefore denied as to Paredes's ratification

3  theory of *Monell* liability.

4          With respect to Paredes's first theory, the city contends that Paredes cannot show that it

5  knowingly failed to discipline Jeffrey for prior uses of excessive force during canine deployments.

6          Although local governments may be held liable for certain "acts or omissions," including a

7  failure to adequately train officers or discipline those officers for repeated violations, *see*

8  *Clouthier*, 591 F.3d at 1249, the failure to discipline must "reflect[] a 'deliberate' or 'conscious'

9  choice by a municipality," *id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). The

10  Ninth Circuit has warned that "this is a high standard"; the "action or inaction [must] amount[] to

11  an official policy." *Id.* "[E]vidence of inaction—specifically, failure to investigate and discipline

12  employees in the face of widespread constitutional violations—can [nonetheless] support an

13  inference that an unconstitutional custom or practice has been unofficially adopted by a

14  municipality." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234 (9th Cir. 2011). Such an

15  inference can arise from "[e]vidence of 'identical incidents' to that alleged by the plaintiff"

16  because identical incidents may tend to "establish that a municipality was put on notice of its

17  agents' unconstitutional actions." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir.

18  2015) (citing *Henry v. Cnty. of Shasta*, 132 F.3d 512, 518–21 (9th Cir. 1997)).

19          In support of his failure to discipline theory, Paredes has submitted six additional body

20  worn camera videos showing instances in which Jeffrey deployed Tex in a manner similar to his

21  deployment during the arrest of Paredes. The evidence demonstrates a similar pattern of behavior

22  by Tex in each instance. Although Paredes's expert testifies that the industry standard for bite

23  duration is less than ten seconds, the duration of Tex's bites in the videos runs from thirty seconds

24  to eighty-nine seconds, with an average bite time of fifty-six seconds. Although the canine

25  certification guidelines require that a police canine release from a bite with only one verbal

26  command**,** the videos demonstrate that Tex failed to respond to a total of twenty-two verbal outs,

27  multiple manual outs, and at least one use of the e-collar. The videos also show a similar pattern of

28  behavior by Jeffrey following Tex's bite. In at least three instances, Jeffrey pulled Tex back

United States District Court
Northern District of California

against a bite. And in two additional instances, Jeffrey pulled Tex by the harness while Tex bit down, dragging an arrestee out of their hiding place. In at least one video, the arrestee is screaming "Help me!," while in multiple other videos, the arrestees do not appear to be actively resisting arrest. In at least one video, the body worn camera depicts an arrestee with his hands clearly in the air at the moment of Tex's deployment.

Relying on *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), the city argues that the six prior instances shown in the videos are "isolated or sporadic events" that do not show "practices of sufficient duration, frequency and consistency" to suggest a "method of carrying out policy." The city contends that the instances portrayed in the six videos are meaningfully different from one another because they each involve different underlying crimes and different facts regarding whether the suspect posed a threat to the officer. According to the city, each of these prior instances must themselves rise to the level of a constitutional violation to support liability. The city also argues that because the police department never received an official complaint about Jeffrey's use of force in these deployments, Paredes cannot show that the prior bites involved conduct for which discipline would have been necessary.

The six videos submitted by Paredes, however, are not as different as the city suggests, and are very different from the "isolated or sporadic incidents" discussed in *Trevino*. That case considered whether the city council had a policy of indemnifying punitive damages awards in civil rights lawsuits against police officers. *Trevino*, 99 F.3d at 918. The evidence purporting to establish such a policy involved about thirteen lawsuits filed over a ten-year period and suggested that the city had "a varied and inconsistent *ad hoc* practice of resolving excessive force cases prior to the incident in question." *Id.* at 920. The Ninth Circuit explained that "[i]f there is a pattern, it is more reflective of normal municipal claims adjusting with all its inconsistencies and imperfections than of subtle conspiracy to indemnify officers outside the public eye." *Id.* at 920.

By contrast, the videos submitted by Paredes show six incidents involving the same officer and canine engaging in nearly identical conduct within about a one-year period. The last video depicts events occurring in October of 2019, just four months prior to Paredes's arrest. This is exactly the kind of evidence of identical incidents that could lead a jury to believe that the city was

on notice of Jeffrey's prior conduct. *See Velazquez*, 793 F.3d at 1027. Given the relatively short time period in which these arrests occurred and the similarity of the conduct portrayed to Paredes's arrest, a reasonable jury could conclude that the videos document a "practice[] of sufficient duration, frequency and consistency" to put the city on notice of Jeffrey's behavior. *Trevino*, 99 F.3d at 918.

The city further argues that the circumstances underlying the six prior arrests involved different facts that might not have amounted to a constitutional violation. But the court need not conclude that each prior incident was itself a constitutional violation in order to conclude that the city was on notice of the behavior that led to a violation of Paredes's constitutional rights. Consider a hypothetical. If a single officer routinely searched the homes of suspects without first seeking a warrant and the city failed to punish him for doing so, it would not necessarily be the case that every prior instance of a warrantless search rose to the level of a constitutional violation. Some suspects might have consented to the search or exigencies might have provided an exception to the warrant requirement. Nonetheless, evidence that the city was aware of but failed to discipline the officer for his repeated practice of not seeking a warrant could lead a jury to conclude that the failure to discipline the officer led to a subsequent unconstitutional search, and this is true whether or not some of the prior searches were constitutionally permissible. Tellingly, while the city relies on cases involving evidence of prior complaints against officers, there is no indication that courts considering the prior complaints in those cases had found that each prior complaint established a constitutional violation. *See, e.g.*, *Velazquez,* 793 F.3d. at 1027.

Here, it is undisputed that the behavior in each of these videos—namely, the duration of Tex's bites, his failure to release upon command, and Jeffrey's pulling against the bite—is out of step with canine certification procedures and industry practice. This, coupled with the similarity between the six videos and Paredes's arrest, could lead a jury to conclude that the city's failure to take any action against Jeffrey despite its knowledge of his prior conduct led directly to the violation of Paredes's Fourth Amendment Rights.

Finally, the city argues that the absence of prior complaints against Jeffrey should be dispositive as to its *Monell* liability. Although the city cites cases that consider prior officer

complaints, it cites no authority holding that a court can *only* consider prior complaints. To the contrary, plaintiffs routinely rely on other forms of evidence to establish *Monell* liability. *See, e.g.*, *Henry*, 132 F.3d at 519 (considering "post-event evidence" such as witness declarations to be "highly probative" to municipal liability); *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018) (considering expert reports, deposition testimony, observations of supervisory staff, and prior events). The critical issue is simply whether the evidence would permit a reasonable jury to conclude that the city's failure to discipline prior similar conduct of which it was aware amounted to a policy or practice of indifference resulting in the violation of Paredes's rights alleged here. Notably, in addition to the six additional videos, Paredes has submitted expert testimony and reports demonstrating Jeffrey's lack of compliance with SJPD's policy and industry practice as well as the city's failure to discipline Jeffrey in response to those prior instances. This evidence creates a genuine dispute of fact as to whether the city's failure to discipline Jeffrey for the prior incidents resulted in the deprivation of Paredes's rights here.

Accordingly, the city is also not entitled to summary judgment on Paredes's failure to discipline theory of *Monell* liability.

## CONCLUSION

For the foregoing reasons, the Court grants summary judgment to Hatzenbuhler, Alleman, and Nail on Paredes's failure to intervene claim and grants summary judgment to the city on Paredes's two customs or practice *Monell* claims. These claims are dismissed with prejudice. The Court denies summary judgment on Paredes's excessive use of force claims against Jeffrey, Alleman, and Hatzenbuhler and denies summary judgment on Paredes's *Monell* claims for ratification and failure to discipline against the city.

**IT IS SO ORDERED.**

Dated: December 18, 2024

_____
P. Casey Pitts
United States District Judge